1
2
3
4
5
6
                    UNITED STATES DISTRICT COURT
7
              FOR THE EASTERN DISTRICT OF CALIFORNIA
8
9   SERGIO SOLIS GONZALEZ,              Case No. 1:16-cv-00455-DAD-JDP
10              Petitioner,             FINDINGS AND RECOMMENDATIONS
                                        TO DENY PETITION FOR A WRIT OF
11          v.                          HABEAS CORPUS
12   DEAN BORDERS,                      ECF No. 1
13              Respondent.             OBJECTIONS DUE WITHIN 14 DAYS
14

15          Sergio Solis Gonzalez, a state prisoner proceeding without counsel, seeks a writ of

16   habeas corpus under 28 U.S.C. § 2254.  Petitioner raises three claims for habeas relief: (1) the

17   government used peremptory challenges to exclude two prospective jurors because of their

18   race; (2) petitioner received ineffective assistance of counsel; and (3) petitioner was convicted

19   on insufficient evidence.  For the reasons discussed below, we recommend that the court deny

20   the habeas petition.

21   **I.  Background**

22          This is a child molestation case.  On November 19, 2009, the government charged

23   petitioner by information with two counts of lewd conduct upon a child under the age of 14.

24   CT 1:104-05; California Penal Code § 288(a).[1]  The first count alleged that petitioner had

25

26   _____
     [1] All "CT" citations refer to the clerk's transcript, which includes the parties' court submissions
27   and exhibits from the state court proceedings.  All "RT" citations refer to the reporter's
     transcript, which includes the trial transcript.  All "Aug. RT" citations refer to the augmented
28   reporter's transcript, which includes the reporter's transcripts showing peremptory challenges.
     The clerk's and reporter's transcripts reflect information concerning two child victims.

                                           1

lewdly touched Mariah[2] on October 9, 2009; the second count alleged that petitioner had lewdly touched Holly on October 10, 2009. CT 1:104-05. The information further alleged the special circumstance of multiple victims, Mariah and Holly. *Id*. at 105 (citing California Penal Code § 667.61(e)(5)). Petitioner pleaded not guilty and proceeded to trial. Petitioner's first trial resulted in a hung jury, and the court declared a mistrial. CT 1:160, 269. Petitioner's second trial resulted in a guilty verdict on each of the two counts and another verdict finding the special circumstance of multiple victims. CT 2:441-443. The trial court sentenced petitioner to two concurrent terms of fifteen years to life. CT 2:492, 494. In this habeas proceeding, petitioner challenges his conviction on the first count.[3]

The following facts are drawn from the opinion of the Court of Appeal of the State of California, Fifth Appellate District (the "Court of Appeal"), and a presumption of correctness applies to them. *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015); ECF No. 14-1. An independent review of the record, *see Nasby v. McDaniel*, 853 F.3d 1049, 1054-55 (9th Cir. 2017), warrants the adoption of the following facts as a fair and accurate summary of the evidence. All alterations come from the Court of Appeal's opinion.

---

Accordingly, respondent should not file the transcripts on the docket absent court order. Petitioner cites to the transcripts, so it appears that he has access to them. All citations to the California Penal Code refer to the version in effect on October 9, 2009, the date of the offense. CT 1:104; CT 2:455.

[2] We omit the last names of the two child victims.

[3] The petition is not moot even though petitioner challenges only one of the two counts that resulted in concurrent terms, each of which required petitioner to serve 15 years to life. The state trial court sentenced petitioner under California's One Strike Law, which imposed a mandatory sentence to 15 years to life for multiple victims. California Penal Code § 667.61(b). *See People v. Rodriguez*, 129 Cal. App. 4th 1401, 1262 (Cal. App. Ct. 2005). A single conviction of a lewd act upon one child under the age of 14 is subject to three, six, or eight years in prison. *See* Cal. Penal Code § 288(a). The state trial court in petitioner's case found multiple victims, Mariah and Holly, for each count—that is, each count enhanced the sentence for the other. CT 2:441-443, 492, 494. Because the first count had a collateral consequence of an enhanced sentence, petitioner can assert habeas claims challenging only the first count. *See Robertson v. Pichon*, 849 F.3d 1173, 1177 n.1 (9th Cir. 2017); *Chaker v. Crogan*, 428 F.3d 1215, 1219 (9th Cir. 2005).

On October 9, 2009, Mariah, then five years old, attended the Big Fresno Fair with her grandmother from approximately 1:00 p.m. to 8:00 p.m. The pair visited the carnival's Kiddie Land area, where Mariah went on at least six rides unaccompanied. She rode "some rides twice . . . [be]cause they were very fun." At around 3:00 p.m. or 4:00 p.m., before the start of a "rollercoaster" that "looked like a caterpillar," the male carnival worker who fastened Mariah's seatbelt placed his right hand underneath her shorts and underwear and touched her vagina with his finger. Mariah was initially too embarrassed to tell anyone about what transpired. Later that night, at home, she told her mother Kristy, "Mom, when I was at the fair, the rollercoaster guy touched me in the vagina." Kristy stated, "Well, sometimes when they clip [the seatbelt] right there, you know, maybe they grazed it on accident." Mariah replied, "No, mommy." She then demonstrated how she was molested. Mariah described the culprit as a man with brown skin, brown eyes, and dark, spiky hair.

On October 10, 2009, Mariah returned to the fair with her parents and reported the incident to Detective Doug Kirkorian. The group proceeded to Kiddie Land and examined at least 20 rides. At retrial, Mariah testified that she pointed to the Little Cricket Express as the caterpillar ride after Kristy remarked, "I think it's that one." By contrast, Kirkorian testified that Mariah did not identify the caterpillar ride. In a subsequent interview on site, Mariah told Kirkorian that "the man who owns the [caterpillar] ride" put his right hand through the leg opening of her shorts and touched her "privates" for less than three seconds. She also specified that the ride was "up high," had "a metal fence with glass," and had a seatbelt "that came over her lap and over her shoulder." Kristy was present during the interview.

Afterward, Mariah and her parents went to the police department for a photo lineup. Detective Alfred Lopez read the standard admonition to Mariah:

> In a moment, I am going to show you a group of photographs. This group of photographs may or may not contain a picture of the person who committed the crime now being investigated. Keep in mind that hairstyles, beards and mustaches may be easily changed. Also, photographs may not always depict the true complexion of a person. It may be lighter or darker than shown in the photo. Pay no attention to any markings or numbers that may appear on the photos or any other differences in the type or style of the photographs. When you have looked at all the photos, tell me whether or not you see the person who committed the crime. Do not tell other witnesses that you have or have not identified anyone.

Mariah was shown a six-photo array that included a picture of defendant. She identified defendant as the perpetrator "in less than 15 seconds," noting his hair and eyes. Lopez informed Mariah that she was "correct" and revealed to her parents that defendant "was already incarcerated for th[e] same action." Kristy told Mariah that "she did a great job" to make "her . . . feel good about what she had

done no matter who she picked" and later gave her a notepad "for doing good and picking the right person."

On October 22, 2009, Mariah was interviewed by Maria Gutierrez at the Multi-Disciplinary Interview Center (MDIC). She told Gutierrez that the man who buckled her seatbelt on the caterpillar ride "went in the inside of [her] clothes and underneath [her] underwear" with his hand and touched the "outside" of her "privates." No one, including her grandmother, could see the incident because "there was a little glass . . . . [¶] . . . [¶] . . . fence" and "the caterpillar ride . . . had a cover." Mariah commented that the touching made her "sad."

At retrial, Mariah, then seven years old, testified that she was molested on the Little Cricket Express. She described the ride:

> I remember the track was flat when you started and it had . . . the caterpillar . . . . And the same color, the same pattern, everything like that . . . [¶] . . . [¶] . . . [B]ut then when you start going, it gets bumpy, bumpy, bumpy and then it goes super high up then it goes down fast, then they unbuckle you. . . [¶] . . . [¶] . . . [W]e went up, down, and then up again and way high up, then back down, super fast, going in a circle. [¶] . . . [¶] . . . And then there was a bump and the rollercoaster kind of went up a little . . . and then . . . I had to get off.

Mariah noted that two men were working at the Little Cricket Express: defendant "buckl[ed] everyone up" while his partner "watch[ed]" and "ma[de] sure he d[id] the job right." However, the partner was unable to witness the touching because he was "below" the ride. Mariah mentioned that she and the prosecutor had looked at photographs of the rides together and the prosecutor "helped [her] a lot . . . . [¶] . . . [¶] . . . by . . . sa[ying] some words . . . to remind [her] about the rollercoaster . . . ."

On cross-examination, defense counsel impeached Mariah with her testimony at the first trial. The following excerpt was read into the record:

> **Q** Mariah I'm gonna show you [a photo of the Wacky Worm]. I'm gonna show this to you.
> **A** Okay.
> **Q** Can you tell us what that is?
> **A** That is the caterpillar that I went on and I was close to the front. I as the second row.
> **Q** You were the second row?
> **A** Yes.
> **Q** Okay. And may I have that back?
> **A** Yes.
> **Q** Thank you. Now I want to make sure I can see?
> **A** That's when I was a little kid because I look little in that picture.
> **Q** Can you see that? There's a bit of a glare.
> **A** I can see it.

**Q** Okay. And . . . is this the ride that you were on when the man touched you?

**A** Yes.

**Q** And is that a roller coaster? We can see it a little bit high?

**A** Yeah, it's a little bit high, not that much, but when it goes on the bump it's high.

Mariah conceded that she made these statements, but said, "[I]f I picked the [Wacky Worm], then I was wrong . . . I was little. So I probably didn't know." Mariah later added, "[A]fter the first court day, I've been thinking about and thinking about it ever since and then today I finally remembered it."

Defendant had been a fulltime employee for Shamrock Shows (Shamrock), a traveling carnival company, since 2008. On October 9, 2009, he served as a "breaker"—one who "gives the ride operators a break"—at the Big Fresno Fair's Kiddie Land area. One of his responsibilities was to check and fasten the seatbelts before the start of the ride. Defendant worked at the Little Cricket Express from 2:42 p.m. to 3:42 p.m., 7:00 p.m. to 8:00 p.m., and 10:15 p.m. to 10:45 p.m. He did not work at the Wacky Worm.

Joseph Blash, Shamrock's president, distinguished the Wacky Worm from the Little Cricket Express:

> [The Wacky Worm]'s a rollercoaster, . . . 90 f[ee]t long, 50 f[ee]t wide, it's got a double layer of track. It's a kind of an 'O,' in a figure eight so it starts up on top [12 feet high] and then goes around the top, comes down and then comes around the bottom later and back in the station. [¶] . . . [¶] . . . [The Little Cricket Express] is a train and [the Wacky Worm] is a coaster. They're . . . kind of similar, they both run on a track and they kind of look similar in shape and design, but [the Little Cricket Express] is definitely a train that stays on the ground that doesn't go up a hill and it's flat all the time. And it runs under its own power. It doesn't run, you know, up a hill and then gravity pulls it along the track. [¶] . . . [¶] . . . [I]t's got an engine in it in the little cars and that propels it along the track. [¶] . . . [¶] . . . A flat track under ground.

Blash testified that the Wacky Worm "has at least two and sometimes three people operating it," whereas "most of the kiddie rides have one person operating them." Neither the Little Cricket Express nor the Wacky Worm had a glass fence. Blash could not recall whether any of the rides in Kiddie Land had lap-and-shoulder seatbelts.

Victoria Willms, a fulltime Shamrock employee and Kiddie Land's supervisor at the time of the incident, testified that both the Little Cricket Express and the Wacky Worm "look like a caterpillar." She described the Little Cricket Express as a "ground train" that "sit[s] on the ground," "doesn't go up or down," is operated by one person, and uses a lap belt. The Wacky Worm, on the other hand, has track supports, "never reach[es] ground level," "go[es] up and down," and is operated by three people.

ECF No. 1 at 14-1 at 3-8; *see also* RT 5: 1089-1157 (Mariah's testimony).

## II. Analysis

A federal court may grant habeas relief when a petitioner shows that his custody violates federal law. *See* 28 U.S.C. §§ 2241(a), (c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 374-75 (2000). Section 2254 of Title 28, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), governs a state prisoner's habeas petition. *See* § 2254; *Harrington v. Richter*, 562 U.S. 86, 97 (2011); *Woodford v. Garceau*, 538 U.S. 202, 206-08 (2003). To decide a § 2254 petition, a federal court examines the decision of the last state court that issued a reasoned opinion on petitioner's habeas claims. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The standard that governs our review of the state court's decision depends on whether the state court adjudicated petitioner's claims on the merits.

When a state court has adjudicated a petitioner's claims on the merits, a federal court reviews the state court's decision under the deferential standard of Section 2254(d). Section 2254(d) precludes a federal court from granting habeas relief unless a state court's decision is (1) contrary to clearly established federal law, (2) a result of an unreasonable application of such law, or (3) based on an unreasonable determination of facts. *See* § 2254(d); *Murray v. Schriro*, 882 F.3d 778, 801 (9th Cir. 2018). A state court's decision is contrary to clearly established federal law if it reaches a conclusion "opposite to" a holding of the United States Supreme Court or a conclusion that differs from the Supreme Court's precedent on "materially indistinguishable facts." *Soto v. Ryan*, 760 F.3d 947, 957 (9th Cir. 2014) (citation omitted). The state court's decision unreasonably applies clearly established federal law when the decision has "no reasonable basis." *Cullen v. Pinholster*, 563 U.S. 170, 188 (2011). An unreasonable determination of facts occurs when a federal court is "convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Loher v. Thomas*, 825 F.3d 1103, 1112 (9th Cir. 2016). A federal habeas court has an obligation to consider arguments or theories that "could have supported a state court's decision." *See Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2557 (2018) (quoting *Richter*, 562 U.S. at 102). In addition, one rule applies to all state prisoners' petitions

adjudicated on the merits:  The petitioner must show that the state court's decision is "so

lacking in justification that there was an error well understood and comprehended in existing

law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

Even when a state court does not explicitly address a petitioner's claims on the merits, a

Section 2254 petitioner still must satisfy a demanding standard to obtain habeas relief.  When a

state court gives no reason for denying a petitioner's habeas claim, a rebuttable presumption

arises that the state court adjudicated the claim on the merits under Section 2254(d).  *See*

*Richter*, 562 U.S. at 99.  And a federal habeas court's obligation to consider arguments or

theories that could support a state court's decision extends to state-court decisions that offer no

reasoning at all.  *See Sexton*, 138 S. Ct. at 2557.

If a state court denies a petitioner's habeas claim solely on a procedural ground, then

Section 2254(d)'s deferential standard does not apply.  *See Visciotti v. Martel*, 862 F.3d 749,

760 (9th Cir. 2016).  However, if the state court's decision relies on a state procedural rule that

is "firmly established and regularly followed," the petitioner has procedurally defaulted on his

claim and cannot pursue habeas relief in federal court unless he shows that the federal court

should excuse his procedural default.  *See Johnson v. Lee*, 136 S. Ct. 1802, 1804 (2016);

*accord Runningeagle v. Ryan*, 825 F.3d 970, 978-79 (9th Cir. 2016).  If the petitioner has not

pursued his habeas claim in state court at all, the claim is subject to dismissal for failure to

exhaust state-court remedies.  *See Murray v. Schriro*, 882 F.3d 778, 807 (9th Cir. 2018).

If obtaining habeas relief under Section 2254 is difficult, "that is because it was meant to

be."  *Richter*, 562 U.S. at 102.  As the Supreme Court has put it, federal habeas review

"disturbs the State's significant interest in repose for concluded litigation, denies society the

right to punish some admitted offenders, and intrudes on state sovereignty to a degree matched

by few exercises of federal judicial authority."  *Id.* at 103 (citation omitted).  Our habeas

review authority serves as a "guard against *extreme* malfunctions in the state criminal justice

systems, not a substitute for ordinary error correction through appeal."  *Id.* at 102-03 (emphasis

added).

### a. *Batson* challenge

The prosecutor in petitioner's case used peremptory challenges to exclude two prospective jurors who had Spanish surnames, V.R. and M.G.[4]  Petitioner's counsel objected, arguing that the prosecutor was excluding V.R. and M.G. because of their race.  The prosecutor responded that he was excluding the two prospective jurors for reasons other than their race: V.R. had served as a juror in a criminal case that resulted in acquittal and M.G. had an older brother in prison.  The trial court found that the prosecutor was not excluding V.R. and M.G. because of their race, and trial proceeded with a jury that included three jurors with Spanish surnames.  The Court of Appeal affirmed the conviction, reasoning that substantial evidence supported the trial court's finding, and the California Supreme Court summarily denied review.  In this habeas proceeding, petitioner claims denial of equal protection under the Fourteenth Amendment, arguing that the government's proffered reasons for excluding V.R. and M.G. were merely pretexts.

Purposeful racial discrimination in jury selection denies the equal protection guaranteed by the Fourteenth Amendment, and a criminal defendant can challenge a racially-motivated peremptory challenge through what is now known as a *Batson* challenge.  *See Batson v. Kentucky*, 476 U.S. 79, 84 (1986); *United States v. Mikhel*, 889 F.3d 1003, 1028 (9th Cir. 2018).  A court assesses a *Batson* challenge in three steps.  *See Mikhel*, 889 F.3d at 1028.  First, a criminal defendant must show a prima facie case that the government used a peremptory challenge because of a prospective juror's race.  *See id*.  Second, if the defendant carries that initial burden, the burden shifts to the government to offer a race-neutral reason for excluding the prospective juror in question.  *See id*.  Third, the court decides whether the defendant has shown purposeful racial discrimination.  *See id*.  The defendant bears the ultimate burden of persuasion to show purposeful racial discrimination.  *See Sifuentes v. Brazelton*, 825 F.3d 506, 515 (9th Cir. 2016).

---

[4] The Court of Appeal and the parties refer to jurors by their initials, and we adopt the same approach.

Here, we assume, without deciding, that petitioner has carried his initial burden of showing a prima facie case that the prosecutor in his case used peremptory challenges to exclude V.R. and M.G. because of their race.[5] No party disputes that the bases for juror exclusion provided by the government—namely V.R.'s prior juror experience that resulted in an acquittal and M.G. having an older brother in prison—are potential race-neutral justifications for exclusion. We therefore proceed to the third step of the *Batson* analysis and assess whether petitioner has carried his ultimate burden of showing purposeful discrimination.

Finding purposeful racial discrimination at the third step of the *Batson* analysis requires the court to evaluate the prosecutor's credibility. *See Sifuentes*, 825 F.3d at 515. The court must consider whether the prosecutor's stated reasons for excluding the juror are genuine and not pretexts designed to hide purposeful discrimination. *See Mikhel*, 889 F.3d at 1029. An inference of pretext may arise when the reasons are implausible, not supported by the record, or fantastic. *See Sifuentes*, 825 F.3d at 516. The court will also consider "subtle impressions" that the court has observed and other intangible factors to assess the prosecutor's credibility. *Sifuentes*, 825 F.3d at 515.

One way to show pretext is through a comparison of excluded and non-excluded jurors. For example, if the stated reasons for excluding an African American juror apply equally to a Caucasian juror, the prosecutor's choice not to exclude the Caucasian juror makes purposeful discrimination more likely. *See id*. at 515-16. On the other hand, if a different treatment of jurors resulted from an honest mistake, the prosecutor might yet be credible. *See Aleman v. Uribe*, 723 F.3d 976, 982 (9th Cir. 2013). The prosecutor need only provide reasons that "should be believed," and those reasons need not show "sound strategic judgment." *Id.* The prosecutor's credibility is a "pure issue of fact." *Sifuentes*, 825 F.3d at 515.

---

[5] Respondent argues that showing the prosecutor excluded a prospective juror with a Spanish surname, absent further evidence of racial discrimination, does not satisfy petitioner's initial burden. We need not decide this issue here because a reasonable jurist can find that petitioner has not carried his ultimate burden of showing purposeful discrimination, as discussed below.

In a habeas case, we are particularly reluctant to overturn a credibility determination affirmed by a state appellate court. On direct appeal, an appellate court will affirm a trial court's credibility determination "unless it is clearly erroneous," meaning that the trial court's decision must leave the appellate court with a "definite and firm conviction that a mistake has been committed." *Id.* On habeas review, a federal court "may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable." *Id.* at 517. Considering these deferential standards together results in a "doubly deferential" standard: "unless the state appellate court was objectively unreasonable in concluding that a trial court's credibility determination was supported by substantial evidence, we must uphold it." *Id.* at 518. The record must "compel" the rejection of the prosecutor's race-neutral reasons and leave "no permissible alternative"—not one. *See Rice v. Collins*, 546 U.S. 333, 341 (2006).

Here, petitioner contends that the prosecutor's stated reasons for excluding V.R. and M.G.—that V.R. had served in a as a juror in a criminal proceeding that resulted in acquittal and that M.G. had an older brother in prison—were pretextual. Petitioner relies on what he describes as evidence of pretext: (1) V.R. could not recall whether the case in which she served as a juror was a civil or criminal case; (2) although V.R. stated that the prior case resulted in a verdict of not guilty, V.R., who was not a lawyer, could have meant by this that her prior jury had found a civil defendant not liable; (3) the prosecutor did not inquire V.R. about her prior juror experience; (4) the prosecutor did not exclude another juror, V.F., who petitioner argues was similar to V.R. and who had served as a juror in a criminal case that resulted in acquittal but did not have a Spanish surname; (5) M.G. was not close to her older brother because she stated that she did not associate with him or visit him in prison; (6) the prosecutor did not ask M.G. whether she could be impartial despite having a brother in prison; (7) the prosecutor did not exclude juror E.S., who petitioner argues was similar to M.G. and who had been the subject of a criminal investigation but who did not have a Spanish surname. *See* ECF No. 1 at 16-24.

In light of the evidence in the record, petitioner's arguments do not provide us with a basis for overturning the state court's credibility determination; the record supports the finding

that the prosecutor did not exclude V.R. or M.G. because of race. When petitioner's counsel sought to exclude M.L., a prospective juror with a Spanish surname, the prosecutor opposed the exclusion of M.L. Aug. RT of October 17, 2009 at 276-78. When petitioner made *Batson* challenges for V.R. and M.G., at least one juror with a Spanish surname remained on the panel, and the prosecutor still had peremptory challenges he could have used to exclude that juror. Aug. RT of Oct. 17, 2009 at 285, 287-88. Although V.R. could not recall whether she had served as a juror in a criminal or civil case, she recalled that the jury returned the verdict of not guilty, which supported an inference that V.R. had served as a juror in a criminal case.[6] V.F., whom petitioner compares with V.R., had served in a jury that returned a guilty verdict, and V.F. indicated that the jury's inability to reach a decision in another criminal case was a waste of time. Aug. RT of Oct. 17 at 195. As for M.G., she could have sympathized with her brother, who was incarcerated, even if she had little or no interaction with him. E.S., whom the prosecutor did not seek to exclude and whom petitioner compares with M.G., had cousins who retired from law enforcement, which the government might have taken as an independent reason not to exclude her.

In sum, the record is inconclusive at best, and a reasonable jurist could find that the prosecutor excluded V.R. and M.G. because they might return a not-guilty verdict, not because of their race. Petitioner has not satisfied the stringent requirement under Section 2254, so the court cannot grant him habeas relief.

---

[6] Petitioner cites a treatise for the proposition that sometimes laypersons use the term "not guilty" in civil context. The treatise states, "A landowner is not guilty of a breach of duty in failing to warn of an obvious danger, for the condition itself serves as a warning; and if the complaint discloses that situation, it fails to state a cause of action." 4 B.E. WITKIN, CAL. PROC. 5TH PLEAD § 604 (2008) (citation omitted). The quoted text, however, is hardly an example of vernacular speech. More to the point, what matters is the motivation of the prosecutor in petitioner's case, not what a layperson might have meant by a not-guilty verdict. The prosecutor could have inferred that, given the jury instructions, verdict forms, and other information ordinarily given to a juror during trial, even a juror who had served in a civil trial would not refer to the verdict as not guilty.

### b. Ineffective assistance of counsel

Petitioner contends that he received ineffective assistance of counsel in violation of the Sixth Amendment because his trial counsel (1) failed to argue that the Mariah was touched by an accidentally and (2) allowed petitioner to be sentenced to 15 years to life in prison. Petitioner raised these arguments in his habeas petition filed before the California Supreme Court, and the California Supreme Court summarily denied the habeas petition. In this habeas proceeding, petitioner repeats the same arguments.

A "doubly" deferential standard governs a federal habeas petitioner's claim of ineffective assistance of counsel. *See id*. at 105. On direct appeal, the two-step inquiry from *Strickland v. Washington* guides the analysis for an ineffective-assistance-of-counsel claim. *See* 466 U.S. 668, 687 (1984). First, a criminal defendant must show some deficiency in performance by counsel that is "so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Id*. Second, the defendant must show that the deficient performance caused him prejudice; this requires him to show "that counsel's errors were so serious as to deprive [the petitioner] of a fair trial." *Id*. On habeas review, coupled with Section 2254(d)'s fairminded-jurist standard, the *Strickland* requirements become even more deferential: The question is "whether there is *any* reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105 (emphasis added). That is, if there is even *one* reasonable argument that counsel did not violate the *Strickland* standard—even if the state court has not identified the argument—then the petitioner cannot obtain habeas relief. *See id*. at 106.

Here, petitioner has failed to satisfy the daunting *Strickland* requirements on habeas review. Neither of the two alleged errors—failure to argue that the touching of Mariah was accidental and allowing the sentence of 15 years to life—satisfies the first prong of Strickland, deficient performance.

### i. Accidental touching

Petitioner contends that his trial counsel should have argued that the touching was "accidental," relying on Mariah's interview in which she referred to the touching as accidental.

ECF No. 1 at 36. Petitioner argues that accidental touching would have defeated the mens rea requirement of the charged offense, lewd act upon a child under the age of 14, because that offense required the government show that petitioner "willfully and lewdly" committed the act with the "intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires." *See* Cal. Penal Code § 288(a)(1).

Although Mariah, a child, said during her interview that a man had "accidentally" touched her, a video recording of the interview provides a basis to conclude that the touching was far from accidental.[7] Here is what Mariah said during her interview:

> **Interviewer**: Yeah, tell me what happen?
> **Mariah:** Um he touched me in the privates.
>
> . . .
>
> **Interviewer:** You said when he was buckling you he touched you on the privates. Now what did he touch your privates with?
> **Mariah:** Uh his hands.
>
> . . .
>
> **Interviewer:** Now did that happen did he do that on top or underneath your cloths?
> **Mariah:** Underneath my clothes.
> **Interviewer:** Okay tell me about that.
> **Mariah:** Um he touched me on the outside.
> **Interviewer:** On the outside of what?
> **Mariah:** my privates but not on the inside of my privates.
> **Interviewer:** So on the outside of your privates but not on the inside of your private. Okay. So just so I'm not confused um . . . did he touch you on the, on the top on the outside or in the inside of your clothes?
> **Mariah:** He went in the inside of my clothes and underneath my underwear and he, he touched me on the outside.
> **Interviewer:** Now how is he able to do that?
> **Mariah:** Because he was holding my pants and he *accidentally* touched it.
> **Interviewer:** Okay so he was holding your pants and he accidentally touched it. What did he touch?
> **Mariah:** My privates.
> **Interviewer:** Your privates. Can you show me on the table how he

---

[7] The jury watched the video recording of the interview. ECF No. 14-1 at 5 n.7.

did that? Go ahead and show me on the table how he accidentally touched your privates.

(Demonstrating)

**Mariah:** 'cause he, his little finger was hanging.
**Interviewer:** His little finger was hanging?
**Mariah:** Yeah it was hanging like this.
**Interviewer:** It was hanging like that.
**Mariah:** And it accidentally went all the way in my clothes into here.
**Interviewer:** And it accidentally did what I'm sorry?
**Mariah:** All the ways in my clothes.
**Interviewer:** All the ways where?
**Mariah:** In my clothes.

ECF No. 15, Ex. 24 at 12:20-15:43 (interview video) (emphasis added); *see also* CT 2:342-345 (interview transcript). The video shows Mariah demonstrating how the man touched her, pointing her hand toward her genital area. ECF No. 15, Ex. 24 at 13:05-30. Mariah also testified in court that the man had touched her vagina underneath her underwear with the middle finger of his right hand and demonstrated in court how the touching occurred. RT 5:1092-95. Considering the evidence, a reasonable attorney could have concluded that it would not be in petitioner's best interests to advance the argument that defendant had touched Mariah accidentally. Petitioner's counsel was not seriously deficient for not arguing that the touching was an accident.

### ii. Sentencing

Petitioner contends that his trial counsel was deficient because the attorney allowed petitioner to be sentenced to 15 years to life in prison. Again, petitioner has not shown deficient performance.

Section 667.61(b) of California Penal Code, a part of California's One Strike Law, imposes a sentence of 15 years to life for an offense listed under subdivision (c) committed under one of the circumstances listed under subdivision (e). *See* Cal. Penal Code § 667.61(b); *People v. Valdez*, 193 Cal. App. 4th 1515, 1521-24 (2011).[8] The enumerated offenses under

---

[8] In 1994, Section 667.61 was added to the Penal Code, and Sections 667.71 and 1203.066 were amended, to ensure that serious sexual offenders would receive long prison sentences, whether

Subdivision (b) include a lewd or lascivious act upon a child under age of 14, and the circumstances under Subdivision (e) include the existence of multiple victims. *See* Cal. Penal Code § 667.61(c)(4), (e)(4). A sentence of 15 years to life was therefore unavoidable under Section 667.61(b). *See People v. Rodriguez*, 129 Cal. App. 4th 1401, 1262 (Cal. App. Ct. 2005). As of the date of the offense, probation was unavailable in cases involving multiple victims. Cal. Penal Code §§ 667.61(g), 1203.066(a)(7), (d)(1). Nonetheless, the trial court had the discretion to impose concurrent terms rather than consecutive terms. *See Rodriguez*, 129 Cal. App. 4th at 1262-63.

Here, petitioner was charged by information with two counts of lewd or lascivious acts upon a child under the age of 14, with multiple victims. CT 1:104-05. The jury returned a guilty verdict on both counts and a separate verdict finding the presence of the multiple-victim circumstance under Subdivision (e). CT 2:455-47. Petitioner received the mandatory sentence for each count, to be served concurrently, CT 2:494-95, even though the sentencing report recommended consecutive terms, CT 2:497. Petitioner does not explain how his trial counsel could have helped him further. Petitioner's counsel was not seriously deficient for allowing petitioner to be sentenced to 15 years to life.

### iii. Evidentiary hearing

Petitioner states in passing that he would like an evidentiary hearing "to address (1) ineffective assistance of counsel; (2) whether the court violated appellant's Fifth, Sixth, and Fourteenth Amendment; and (3) whether the court violated appellant's right to counsel." ECF No. 1 at 38. Petitioner does not explain why he would be entitled to an evidentiary hearing.

A state prisoner seeking an evidentiary hearing must show that he "was not at fault in failing to develop that evidence in state court, or (if he was at fault) if the conditions prescribed by § 2254(e)(2) were met." *Holland v. Jackson*, 542 U.S. 649, 652-53 (2004). Under

---

or not they had any prior criminal conviction. *People v. Wutzke* 28 Cal.4th 923, 926, 929 (Cal. App. 2002). These statutes are collectively referred to as the One Strike Law.

§ 2254(e)(2), the petitioner must show either a new, retroactive rule of constitutional law that

was unavailable to him or a fact that he could not have discovered through the exercise of due

diligence.  28 U.S.C. § 2254(e)(2)(A)(ii).  When the petitioner fails to carry this burden, the

court may not hold an evidentiary hearing.  *Id*. § 2254(e)(2).

Here, petitioner does not argue that he was without fault in failing to develop the record.

He does not identify a new, retroactive rule of constitutional law that was unavailable to him.

He also does not identify any fact that he could not have discovered through due diligence.

The court therefore cannot hold an evidentiary hearing.

### c. Insufficient evidence

Petitioner contends that his due process rights under the Fourteenth Amendment have

been violated because he was found guilty of count one despite insufficient evidence.  In

support of his claim, he argues that there was insufficient evidence that: (1) the touching was

intentional; and (2) petitioner was the man who touched Mariah.  The Court of Appeal rejected

petitioner's arguments on the merits, finding that substantial evidence supported the jury's

guilty verdict.

A habeas petitioner challenging the sufficiency of evidence must overcome "two layers

of judicial deference."  *Coleman v. Johnson*, 566 U.S. 650, 651 (2012).  Under *Jackson v.

Virginia*, the appellate court on direct appeal decides "whether, after viewing the evidence in

the light most favorable to the prosecution, *any* rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt."  443 U.S. 307, 319 (1979)

(emphasis in original).  On habeas review, "a federal court may not overturn a state court

decision rejecting a sufficiency of the evidence challenge simply because the federal court

disagrees with the state court.  The federal court instead may do so only if the state court

decision was objectively unreasonable."  *Maquiz v. Hedgpeth*, 907 F.3d 1212, 1225 (9th Cir.

2018) (quoting *Coleman*, 566 U.S. at 651).  Combining the *Jackson* and Section 2254

deference, petitioner must show that "*no* fairminded jurist could conclude that *any* rational trier

of fact could have found sufficient evidence to support the conviction."  *Id*. (emphasis in

original).

### i. Accidental touching

Petitioner's first argument warrants little discussion. As discussed above, Mariah said during her interview that a man accidentally touched her, but the video recording of Mariah's interview supports a different interpretation. The jury saw the video recording of the interview, which included Mariah's demonstration of how the man touched her. ECF No. 14-1 at 5 n.7; ECF No. 15, Ex. 24 at 12:20-15:43. A fairminded jurist could find that the video recording shows that the man willfully and lewdly touched Mariah with the intent of gratifying his sexual desires.

### ii. Identity

Petitioner next contends that there was insufficient evidence that he was the man who touched Mariah. Petitioner argues that Mariah's identification of petitioner as the perpetrator was unreliable for numerous reasons. According to petitioner:

1. Mariah stated that the man had touched her on a rollercoaster, but the Little Cricket Express did not fall under the definition of a rollercoaster because the train stayed on the ground throughout the ride; the Wacky Worm was a rollercoaster, as the train traveled off the ground, with ups and downs.
2. Mariah described the seatbelt on the ride as having joint shoulder and waist strap, but neither the Little Cricket Express nor the Wacky Worm had such a belt.
3. Mariah admitted that during the first trial, she identified the ride as the Wacky Worm.
4. When Mariah walked back and forth through the Kiddie Land with detectives Dyer and Kirkorian, Mariah could not identify the ride where the touching occurred.
5. Mariah identified the Little Cricket Express as the ride where she was touched only after her mother said, "Mariah, I think it's that one!"
6. Mariah stated that two workers were present at the ride where she was touched, but the Little Cricket Express had only one operator, while the Wacky Worm had two operators.
7. Mariah's grandmother stated that Mariah had been on a caterpillar roller coaster ride between 3 and 4 p.m., but petitioner's shift had ended at 2:33 p.m.
8. Mariah was coached by the prosecutor to identify the Little Cricket Express as the ride where the touching occurred.
9. Mariah's pretrial identification of petitioner as the perpetrator during a photo-lineup was tainted by comments by Detective Lopez and Mariah's mother that Mariah was "correct" and "did a great job."
10. The pretrial identification during a photo-lineup was the product of Mariah's poor perception and memory.

1   *See* ECF No. 1 at 25-33.  Despite petitioner's contentions, a reasonable jurist could find

2   sufficient evidence to conclude that petitioner was the man who touched Mariah.  Mariah's

3   inaccurate recollections of where or when the crime occurred did not warrant setting aside the

4   jury verdict.  A reasonable juror could conclude that the inaccurate recollections resulted from

5   Mariah's age and her experience visiting multiple rides at the Fresno Fair.  Mariah testified that

6   both the Little Cricket Express and the Wacky Worm looked like rollercoasters to her.  RT

7   5:1116.  Detective Lopez testified that Mariah's various descriptions of the ride were

8   combinations of different rides and were inconsistent with either the Little Cricket Express or

9   the Wacky Worm.  RT 7:1794 ("[T]here were bits and pieces of the rides, but they were of

10  different rides.").  In any event, victims "often confuse the details of particular incidents," *see*

11  *Ren v. Holder*, 648 F.3d 1079, 1085-86 (9th Cir. 2011), and a witness's account of when an

12  event occurred is a "poor test" of credibility, *see id*. at 1086.  Despite the inaccurate

13  recollections as to *where* or *when* the crime took place, what mattered was *who* molested

14  Mariah.  Mariah identified petitioner as the perpetrator in a photo lineup within 15 seconds,

15  and that prompt identification provides sufficient basis for the jury's verdict.

16      Petitioner's ninth and tenth arguments, noted above, challenge Mariah's identification

17  during the photo lineup, but those arguments lack merit.  As for the ninth argument, comments

18  by Detective Lopez and Mariah's mother that Mariah was "correct" and "did a great job" were

19  uttered only after Mariah's prompt identification of petitioner as the perpetrator.  Petitioner

20  does not argue that the photo lineup was suggestive or rushed in any way.  He also does not

21  dispute that Mariah had heard and understood the instruction that the photographs might or

22  might not include the perpetrator.  A reasonable jurist could find that those comments uttered

23  after Mariah's identification did not affect Mariah's pretrial identification.

24      As for the tenth argument, petitioner fails to show how Mariah's identification during a

25  photo-lineup was the product of Mariah's poor perception and memory.  Petitioner argues:

26          [H]er single identification of appellant was subject to various
            perception and memory challenges.  For example, did Mariah
27          identify appellant simply because she recognized him from his
            having been at the fair, unlike all the other non-fair employees
28          whose photographs were included in the lineup.  In other words,

18

appellant may have looked familiar to Mariah because she had seen him working a breaker on a ride she rode but on which she was not touched, unlike the other five subjects, whom she had never seen before.

ECF No. 1 at 32. Petitioner cites no evidence in support of his argument, and the court need not accept petitioner's unsubstantiated theory. Besides, petitioner's counsel thoroughly challenged Mariah's identification of petitioner during four cross-examinations, and the jury nonetheless chose to credit Mariah's identification after considering the evidence presented. *See* RT 5:1110-1143, 1151-1153, 1156-57.

We end by addressing petitioner's allegation that the prosecutor had coached Mariah to identify the Little Cricket Express as the ride where the touching occurred. Petitioner relies on Mariah's testimony:

[M's first cross-examination]

. . .

**Q** The last time you were in court you didn't remember?
**A** Yeah, I didn't remember, but now, I remember somehow, I don't know—
**Q** Okay
**A** —how I remember, it's weird.
**Q** It's weird okay. Did my friend here help you remember?
**A** Yeah. He helped me a lot actually.
**Q** He helped you a lot?
**A** Uh-huh.
**Q** How did he help you?
**A** *He helped me by, um, I think he said some words to remind me about the rollercoaster*, something like that.
**Q** Oh, yeah?
**A** I think so. I—*I don't remember*.

. . .

[M's first redirect examination]

. . .

**Q** Okay. So let's see, oh, I know what I was going to ask you. Now, I'm showing you what's been marked Defense Exhibit U and Defense Exhibit K for identification purposes. Do you remember seeing those pictures before?
**A** I remember seeing both.
**Q** Okay.
**A** Yeah, both.
**Q** And —
**A** One you showed me at a different court and you showed me this

court and this one, I remember what it looks like 'cause I was
waiting in line 'cause there was a big line. So I remember what it
looks like.

**Q** Okay. And when you and I have talked about pictures, has it only
been in the courtroom that we've talked about the pictures or
somewhere else?

**A** I think *only in the courtroom*.

**Q** Okay. We didn't talk about them in the hallway?

**A** Are you talking about just now?

**Q** Yeah, did we talk about these pictures at all outside of the
courtroom anywhere?

**A** No, we didn't talk about them. That's what I remember. I don't
have a good rememberies.

. . .

**Q** Okay. And, um, I know that you and I talked about how you and
I haven't gone over these photographs outside of the courtroom.
Has anybody gone over these photographs with you outside of the
courtroom?

**A** *No, Just you.*

**Q** Okay. And were we *outside of the courtroom* when we went over
them?

**A** *I think so*.

**Q** Okay. Do you remember where we were?

**A** No.

**Q** Okay. Do you remember when it was?

**A** I think it was on a Wednesday.

**Q** Okay. Was it in fact, um, a Wednesday that was recent or a
Wednesday that was a long time ago, or do you not know?

**A** A Wednesday that was a long time ago. I think it's a Wednesday,
I'm not sure.

**Q** Okay. Do you know for sure we went over the photographs
together outside of the courtroom?

**A** *No, not for sure*.

. . .

[M's second redirect examination][9]

**Q** If I may just briefly—I've got another maybe one or two questions
for you, okay?

**A** Okay.

**Q** So did anybody ever tell you that you got the ride pictures wrong?

**A** Well, after I said—I said the name 'cause I could read them, I said
the name and the picture name was, um, they called it a UK and I
said UK and they said that is correct.

**Q** Okay. So nobody's ever told you that you've got the ride pictures
wrong?

---

[9] During the second cross-examination, petitioner's counsel questioned Mariah about a
photograph of Mariah riding a rollercoaster and did not ask whether the prosecutor had coached
her. RT 5:1151-52.

**A** No—well, after that they said, "you got it right, you got it right. Good girl."

. . .

[M's third cross-examination]

. . .

**Q** Um, which picture were you told that you got right, do you remember which one? Was it a ride picture?
**A** Yeah.
**Q** And when they said, um, "Good girl, you got it right," which— who said that, baby?
**A** My mom and dad.

. . .

[M's third redirect examination]

. . .

**Q** Okay. So nobody ever told you that you got the rides incorrect?
**A** *Nobody—nobody ever told me that I got the ride incorrect or correct. I just looked at it and then I remember in my head.* So I chose—chose this one (indicating) 'cause this one's the right one I'm pretty sure.
**Q** Okay.
. . .

RT 5: 1125, 1143-44, 1148-49, 1152-53, 1155-56. Mariah's testimony does not compel a finding that the prosecutor coached Mariah. The jury heard Mariah's testimony and decided to credit her identification of petitioner as the perpetrator. A fairminded jurist could find sufficient evidence for petitioner's conviction. No other habeas claim remains for adjudication.

### III. Certificate of appealability

A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district court's denial of a petition; he may appeal only in limited circumstances. *See* 28 U.S.C. § 2253; *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). Rule 11 Governing Section 2254 Cases requires a district court to issue or deny a certificate of appealability when entering a final order adverse to a petitioner. *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997). A certificate of appealability will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C.

§ 2253(c)(2). This standard requires the petitioner to show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *accord Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, petitioner has not made a substantial showing of the denial of a constitutional right. The court should therefore decline to issue a certificate of appealability.

## IV. Findings and recommendations

We recommend that the court deny the petition for a writ of habeas corpus, ECF No. 1, and decline to issue a certificate of appealability.

These findings and recommendations are submitted to the U.S. District Court Judge presiding over this case under 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within 14 days of the service of the findings and recommendations, petitioner may file written objections to the findings and recommendations with the court and serve a copy on all parties. That document must be captioned "Objections to Magistrate Judge's Findings and Recommendations." The District Judge will then review the findings and recommendations under 28 U.S.C. § 636(b)(1)(C). Petitioner's failure to file objections within the specified time may result in the waiver of rights on appeal. *See Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014).

IT IS SO ORDERED.

Dated:    December 7, 2018

UNITED STATES MAGISTRATE JUDGE